**STATE of Minnesota, Respondent,**

v.

**Lloyd David VanWAGNER, petitioner, Appellant.**

**No. C2–92–247.**

Supreme Court of Minnesota.

Aug. 20, 1993.

Lawrence W. Pry, Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Martin J. Costello, St. Paul, for respondent.

SIMONETT, Justice.

Defendant-appellant raises issues relating to *Miranda* and prosecutorial misconduct in this appeal from a conviction for an aggravated DWI violation, which has been affirmed by an unpublished decision of the court of appeals. Upon review, we reverse for a new trial.

On August 2, 1989, at 6 p.m., two deputies responded to a radio dispatch concerning a vehicle stopped on Centerville Road in White Bear Township. They found a Ford automobile stopped mostly in the northbound lane of travel. The engine was not running. There were two apparently unconscious men in the Ford, one in the front seat and the other partly in the rear seat and partly on the ground outside the open righthand door. The man in the front seat was defendant-appellant Lloyd VanWagner; in the back seat was his friend, Robert Soland. Beer cans, some open and some sealed, were in the car.

When Deputy Robert LaBathe shook VanWagner to wake him up, the defendant said, "Leave me alone. You can't arrest me. Where are the keys?", then fell back asleep. The deputy awoke defendant a second time, and helped him out of the car, noticing the man's bloodshot eyes, slurred speech, and beer-breath. Deputy LaBathe assisted defendant back to the squad car, frisked defendant, and placed him in the back seat, closing the door. The standard protective screen separated the front and back seats of the squad car, and the defendant, for all practical purposes, was caged. Deputy LaBathe testified that VanWagner was not then "in custody," but was not free to go unless further investigation would clear him.

While VanWagner was in the squad car, and before any *Miranda* warning, Deputy

LaBathe had several bits of conversation with defendant as follows:

1) The deputy asked defendant if he had been driving, and VanWagner responded, "F ... you. Go find the keys."

2) The deputy asked why the car was stopped in the middle of the road, and defendant answered, "I ran out of gas."

3) When asked to take a field sobriety test, the defendant said, "F ... you. I am not taking anything."

4) When the deputy prepared to administer an intoxilyzer test, defendant refused, explaining "[b]ecause I don't think it's right, you didn't catch me driving."

After this last exchange, the deputy advised VanWagner that he was under arrest for aggravated DWI. VanWagner was taken out of the squad car, read his *Miranda* rights, handcuffed, and then placed back in the rear seat of the squad car. On the ride to the jail annex, Deputy LaBathe said VanWagner made several threats against him.

At the *Rasmussen* hearing immediately before trial, the court ruled all the statements made by VanWagner both before and after his formal arrest were admissible. The very first statement, ruled the court, was a voluntary remark; the four other pre-*Miranda* statements were the product of preliminary investigation, and the post-arrest threats were voluntary and, of course, made after the *Miranda* warning. Thus the first issue raised by defendant on appeal is whether the pre-*Miranda* statements should have been excluded.

The second issue relates to the prosecutor's attempts at trial to get certain hearsay testimony before the jury. At the time of the initial investigation, Deputy LaBathe asked the passenger in the Ford, Robert Soland, who had been driving and had parked the car on the roadway. Soland replied, "Red was," indicating the defendant VanWagner. Soland did not testify at the trial.

In his opening statement at the trial, the prosecutor (the state is represented by different counsel on appeal) told the jury that the deputy would be testifying to Soland's statement that VanWagner had been driving the car. Defense counsel objected, saying this would be hearsay, and the trial court sustained the objection.

Three deputies testified at trial for the state, including a deputy to whom defendant in a post-*Miranda* statement said that his girlfriend had been driving the car and that she had gone for help when the car malfunctioned. Officer LaBathe, during his direct testimony, said no girlfriend ever showed up nor had VanWagner ever mentioned to him at the scene anything about a girlfriend. Deputy LaBathe then said he had asked the passenger, Robert Soland, who had been driving. The trial court then allowed the prosecutor, over a hearsay objection, to ask the deputy why he had put this question to Soland. The deputy replied that he didn't feel he had an admission from defendant VanWagner that he was the driver. Then,

Q. Did the individual [Soland] * * * answer your question?

A. Yes, he did.

Q. What was his answer?

Defense Counsel: Objection, hearsay.

The Court: Sustained.

In the second deputy's direct examination, this exchange took place:

Q. Did you ask—I don't want the response if there was one—but did you ask Mr. Soland * * * who drove the car to that location?

A. Yes, sir, I did.

Q. Did he give you—again I don't want the answer. That would be hearsay. Did he give you an answer?

A. Yes, sir, he did.

Q. Thank you. * * *

Defendant VanWagner took the stand in his own defense. He denied saying the Ford had run out of gas (in fact, it had not); instead he claimed he said simply the car "ran out," meaning of water, not gas. He repeated his story that the girlfriend had been driving and claimed that after the girlfriend left for water, he laid down in

the front seat to take a nap. Defendant denied knowing the car keys were under the front seat (which is where they were found), saying he thought the girlfriend had left with them.

In closing argument, without objection from defense counsel, the prosecutor twice returned to Soland's hearsay statements:

> One of the questions they asked him [Soland] was, 'Who was driving?' He answered that question. You didn't hear his response. But it was with that question, that answer, that the officers further firmed up their conclusion that, as Mr. VanWagner said, he was the one who drove to that location.

Then again, a little later:

> They talked to Mr. Soland and he was asked who was the driver and he answered that question, and that answer was taken into consideration by the deputies in charging Lloyd VanWagner. He is already confirmed by his good friend as the driver. No further investigation was needed.

## I.

■ We agree with the trial court and the court of appeals that the pre-*Miranda* statements were properly admitted. Whether or not "a reasonable person in the place of the detainee would believe he or she was in custody" depends on an evaluation of the facts and circumstances of the particular case. *State v. Rosse*, 478 N.W.2d 482, 484 (Minn.1991); *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). See also the factual situations in *State v. Herem*, 384 N.W.2d 880 (Minn.1986) and *State v. Walsh*, 495 N.W.2d 602 (Minn.1993).

■ Here, it is true, defendant VanWagner was in the locked back seat of the squad car when he was questioned, and was not free, at least for the time being, to leave. The fact is, however, VanWagner had to be put somewhere. In his drunken condition he could hardly be left in the Ford parked in the middle of the road. VanWagner was not handcuffed. No guns were drawn. There was no threatening conduct by the deputies. The questioning took place in broad daylight on an open township road, with only two officers present and only one, Deputy LaBathe, asking VanWagner some questions. Here VanWagner was being detained under relatively unthreatening circumstances while being asked a few questions to ascertain generally what had happened and to obtain information either confirming or dispelling the deputy's suspicions.

## II.

Robert Soland, the back seat passenger, told Deputy LaBathe (so says LaBathe) that VanWagner had been driving the car. It was inadmissible hearsay for the deputy to testify to what Soland had said. Soland was the declarant of the statement and the statement was sought to be elicited for its truth. Yet the prosecutor persisted by various tactics to get Soland's statement before the jurors. Everyone agrees this was improper conduct.

■ The question before us is whether there should be a new trial. The court of appeals thought not, reasoning, "While the prosecutorial misconduct was significant and deserves censure, the admissible evidence was sufficient to establish appellant's guilt beyond a reasonable doubt"; the correct test, however, is not whether the evidence establishes the defendant's guilt beyond a reasonable doubt, but whether the error is harmless beyond a reasonable doubt. And so we granted defendant's petition for further review.

■ Misconduct is deemed harmful if it played a significant or substantial role in persuading the jury to convict. The more serious the misconduct, the more likely the misconduct was harmful. In any case, the test is whether the misconduct is harmless beyond a reasonable doubt. *E.g., State v. Forcier*, 420 N.W.2d 884, 887 (Minn.1988). The error and its impact are to be examined within the context of the record as a whole, considering the strength of the state's evidence and the weaknesses of any defense evidence.

In this case, it was critical for the state to prove that defendant VanWagner had driven the car to its stopped position on the highway, if it was to prove the defendant guilty of driving, operating, or being in physical control of the motor vehicle while under the influence of intoxicating liquor. The evidence to establish that defendant was the driver was overwhelming. Defendant was found drunk, slumped behind the steering wheel, in a car that was illegally stopped on the traveled portion of the highway. Defendant was the owner of the car and the car keys were under the driver's seat. "I ran out of gas" was defendant's explanation for his car being where it was, according to the deputy. No one has ever seen defendant's girlfriend.

Defendant argues, however, that there was evidence from which a jury could have found that he had not been driving, evidence which the jury might have believed, absent the hearsay. Defendant points out he testified that he was not slumped behind the steering wheel but was lying down on the seat; that when he said, "I ran out of gas," he really meant, "It ran out of water"; and that he testified his girlfriend had been driving, but had left for help after the car became disabled, leaving the car keys, unbeknownst to him, under the front seat. Of course, for VanWagner to show he was not the driver, he had to show that someone else was the driver.

Arguably, defendant's story is so lacking in credibility (and also, one might add, in originality) that one could say, without harboring a reasonable doubt, that prosecutorial misconduct played no significant or substantial part in the guilty verdict. Still, the hearsay innuendo goes directly to the disputed identity of the driver,[1] and while we are not inclined to give defendant an opportunity for a repeat performance of his story, whether the misconduct was harmless is a close question. But even if the misconduct were harmless, we conclude we should reverse for prophylactic reasons. *State v. Kaiser,* 486 N.W.2d 384, 387 (Minn.1992) (new trial granted prophylactically even though "it is at least arguable that the defense was not prejudiced by nondisclosure and that therefore a new trial is not required"); *State v. Salitros,* 499 N.W.2d 815, 820 (Minn.1993) (guilty verdict reversed prophylactically, quoting *Kaiser*).

The rules of evidence are designed to produce the kind of stringent truth needed for a just verdict of guilt or innocence. At times, this means, as in the case of hearsay or *Spreigl* evidence, some kinds of truth are kept from the factfinder; for if the hearsay rule were to be honored only in the breach, it would not be long before the second-hand assertions of truth received in evidence would raise more doubts than are put to rest.

The prosecutor is bound to seek that truth which is governed by the rules of evidence, a task we recognize is not always easy. At stake, nevertheless, is the integrity of the factfinding process itself, which we in the exercise of our supervisory powers must protect. For, as Queen Elizabeth put it centuries ago, the prosecutor is "not so much retained *pro Domina Regina* [For Our Lady the Queen] as *pro Domina Veritate* [For Our Lady Truth]."[2]

Reversed and remanded for a new trial.

---

1. The prosecutor claims his direct examination of the second deputy ("Were you asked who was the driver? Just answer yes or no and don't say what was said.") was intended only to preclude the defense from arguing that the deputies had not conducted a thorough investigation. While there might be occasions when such a tactic could be employed, the prosecutor's overall questioning was too pointed, too persistent, to make that explanation plausible here. The prosecutor's subsequent ploy during final argument in drawing the inference that Soland had identified defendant as the driver suggests the prosecutor's true motives in questioning the deputy.

2. Charles Edward Lloyd, *State Trials* (1899), preface to Trial of Sir Walter Raleigh, p. 62, footnote.