**STATE of Minnesota, Respondent,**

v.

**Secundus Arie RAY, Appellant.**

No. C0–00–228.

Supreme Court of Minnesota.

April 17, 2003.

738

Mark D. Nyvold, St. Paul, MN, for Appellant.

Mike Hatch, Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for Respondent.

## OPINION

HANSON, Justice.

Appellant Secundus Ray was convicted of murder in the first degree in connection with the shooting death of Chauncey Teasley on June 13, 1998, in North Minneapolis. On appeal, Ray argues that (1) his in-custody statement to police, used against him at trial, was obtained in violation of his right to counsel, and (2) prosecutorial misconduct, during testimony of a police officer and in closing argument, deprived him of a fair trial. Ray also raises a number of pro se issues. We reverse and order a new trial on the grounds that portions of Ray's in-custody statement were obtained in violation of his right to counsel.

On June 13, 1998, Chauncey Teasley and two of his cousins visited Depring Jackson at her apartment in a high-rise building at 1201 12th Avenue North in North Minneapolis. The security guard, Mitchell Hicks, observed their arrival. After the visit, Teasley was standing in front of the building talking to Jackson and her sister. While they were talking, a red Ford Taurus pulled into the parking lot. Hicks had previously seen the car at the building. Hicks testified that the people in the Taurus appeared to be friends of Jackson.

Although she initially denied it both to the police and the grand jury, Jackson later said that she knew both individuals in the Taurus. Jackson testified at trial that the individuals in the car were Coley Gates,[1] the driver, and Ray, the passenger. Jackson's sister did not identify Ray as the passenger when she first talked to police but later picked him out from a photo lineup.

Hicks was never able to identify either Gates or Ray in lineup photos. He described the driver of the Taurus as dark-skinned, wearing a red cap and red shirt, with braided hair, and the passenger as light-skinned, 6 feet 2 inches tall, wearing a blue shirt and blue jeans.

Gates got out of the Taurus, and several individuals witnessed what appeared to be a confrontation between him and Teasley. Teasley returned to the car where his cousins were waiting and said, "I think

---

1. Gates was also tried and convicted for the murder of Teasley. We affirmed that convic-tion. *State v. Gates*, 615 N.W.2d 331, 335 (Minn.2000).

they're about to get me" and "That's the dude CK[2] I got into it with." A camera monitoring the building then showed Teasley running down the sidewalk. He ran to a wooded area south of the apartment complex.

Jackson told the cousins to get Teasley. When they pulled out of the parking lot, driving east and then south of the apartment complex, the Taurus followed closely. A few moments later, the Taurus turned right toward the wooded area, while the cousins continued straight ahead. The cousins made several turns and ultimately returned to the west of the apartment complex. Neither of the cousins heard any gunshots.

Teasley was shot near the wooded area south of the apartment complex. No witness claimed to have seen the actual shooting. Several witnesses testified about the number of shots they heard. At trial, Hicks testified that he heard two volleys of gunshots, three shots each. At the scene, however, he told officers he heard five sounds like firecrackers, a pause, and then six shots. Jackson testified that she heard six shots, a pause, and then six more. Her sister testified that she heard eight shots, then a pause, then two or three more. She stated that the second round of shots sounded different. Kiachi Blake, a nearby resident, claimed she heard four shots, as did another resident, Kimberly Cooper.

Both Blake and Cooper saw a man running from the scene of the shooting. Blake testified at Ray's trial that the man was wearing short blue jeans, a red shirt, and a red jacket. However, before the grand jury and during Gates' trial, she testified that the person fleeing wore a blue and white jacket. She described his height as 5 feet 3 inches, although she had

previously given his height as 5 feet 6 inches or 5 feet 7 inches. Cooper testified that the man she saw fleeing wore a blue jacket with white stripes and had a red rag in his pocket.

When the area of the shooting was searched, investigators located seven expended shell casings, all fired from the same weapon, as well as one live round and a cell phone. Ray's then-girlfriend Latasha Johnson had given Ray the phone a few months earlier, but there was evidence that Gates also used the phone. Ray later told Johnson he had lost the phone.

Ray was indicted by a grand jury for first-degree murder on October 27, 1998. He was later arrested in Chicago. Two Minneapolis police investigators, Sergeant James Violette and Sergeant Michael Tichich, traveled to Chicago to interview Ray on November 9, 1998.

Sergeant Violette read Ray his *Miranda* rights. After Ray agreed to talk to the police, they repeatedly informed Ray that they knew he was present at 1201 North 12th Avenue on the day of the shooting. They then informed him that he had been indicted by a grand jury for murder in the first degree and that he needed to "stop pretending" that he was not aware of why the police were questioning him. The police went on to say that if Ray started out with an obvious lie, "then nobody believes you." Ray then stated:

Ray: *Then get me a public defender down here because you're kind of getting upset and you want to act like you want to try to take this shit out on me like I've got [to] lie. Nobody got to lie to you. I got nothing to lie to you for.*

---

2. Testimony at trial established that Gates went by two different nicknames: "CK" and "CJ."

[Inaudible]

Ray: Take me back then.

Violette: We are not the ones that are going to take you back to Minnesota.

(Emphasis added.)

Following this brief discussion, which the state characterizes as a discussion about extradition, Sergeant Tichich went on:

Tichich: You indicated that you wanted a public defender so when you say that, we have to leave and honor your request * * *. Now, we had hoped that we could (inaudible) address some things, we could share some information and you could make a decision about what you weren't going to say or were going to say * * * but we can't do that as long as you have asked for an attorney. * * *

Ray: I was gonna talk to you all as long as you don't get upset. * * *

Tichich: * * * [W]e'll try not to be accusatory * * * we came a long way from Minneapolis in an airplane here to try to talk to you and share some things with you * * * and that you could make your best judgment * * * and make that assessment as to what the best thing for you would be. We can't do that unless you clearly say * * * ["]I don't want to have a public defender here, I am willing to continue the conversation.["]

Another discussion about extradition procedure followed. Ray then stated:

Ray: Alright, what's you all gonna talk about?

Tichich: You willing to talk?

Ray: Yeah[,] go ahead.

Tichich: Without an attorney present?

Ray: Yeah, without you all being upset and shit.

The interrogation then ensued. At first, Ray continued to deny being present at the apartment complex on June 13, 1998. He eventually admitted being present but denied any involvement in the shooting. At trial, the district court admitted testimony concerning the statements made by Ray in this custodial interrogation. The state used Ray's repeated denials, followed by admissions, to argue that an innocent individual would not have lied repeatedly to the police.

Ray appeals his conviction of murder in the first degree.

I.

█ Ray argues that the admission of testimony concerning statements be made in custodial interrogation was reversible error because his statements were obtained after he made a clear and unequivocal request for the assistance of counsel. The right to have counsel present during all custodial interrogations is undisputed. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The United States Supreme Court elaborated upon this requirement in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), holding that once an accused has expressed a desire to deal with police only through counsel, he or she cannot be further interrogated absent counsel unless the accused initiates further conversation. *Id.* at 484–85, 101 S.Ct. 1880 *cited in State v. Munson,* 594 N.W.2d 128, 138 (Minn. 1999).

█ The request for counsel must be clear and unequivocal. *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350,

129 L.Ed.2d 362 (1994). A request for counsel is considered to be unequivocal if it is articulated "sufficiently clearly that a reasonable police officer, in the circumstances, would understand the statement to be a request for an attorney." *Munson*, 594 N.W.2d at 139 (quoting *Davis*, 512 U.S. at 459, 114 S.Ct. 2350). But even if the request is equivocal, police may only ask narrow questions designed to clarify the desire to obtain counsel. *State v. Robinson*, 427 N.W.2d 217, 223 (Minn.1988).

The state bears the burden of demonstrating that any claimed waiver of *Miranda* rights was knowing, voluntary and intelligent. *State v. Hannon*, 636 N.W.2d 796, 806 (Minn.2001) (citing *State v. Linder*, 268 N.W.2d 734, 735 (Minn. 1978)). This court reviews the district court's findings of fact for clear error but conducts a de novo review of the district court's legal conclusions based on those findings. *Id.* at 806 (citing *State v. Dominguez–Ramirez*, 563 N.W.2d 245, 252 (Minn.1997)).

Early in the interrogation, Ray told police "[t]hen get me a public defender down here because you're kind of getting upset and you want to act like you want to try to take this shit out on me like I've got [to] lie." The state argues that the explanation made the statement equivocal and that the discussion that followed was merely a response to Ray's seeming confusion about whether he would be extradited to Minnesota to stand trial. The state asserts that this "extradition discussion" did not amount to continued interrogation but was rather designed to clarify Ray's wishes.

The state's position fails for two reasons. First, the invocation was clearly unequivocal. In *Munson*, this court found that the statement "I think I'd rather talk to a lawyer" was unequivocal. 594 N.W.2d at 138–39. In *Hannon*, we held that the statement "[c]an I have a drink of water and then lock me up—I think we really should have an attorney" was also unequivocal. *Hannon*, 636 N.W.2d at 804–05. We see nothing in Ray's statement— "[t]hen get me a public defender down here"—to render it equivocal in light of these holdings. Moreover, Officer Tichich's subsequent comments make it clear that the police were aware of the unequivocal nature of Ray's request. Tichich told Ray that the officers would need to leave because Ray had invoked his right to counsel, stating, "You indicated that you wanted a public defender so when you say that, we have to leave and honor your request * * *." This response from the interrogating officer is very similar to what occurred in *Hannon*, where this court recognized that the objective sufficiency of an invocation of a right to counsel was supported by the reaction of the interrogating officers. *Id.* at 805. There, the detective responded by saying, "If you want to talk to an attorney, you understand that we have to stop talking to you. OK?" *Id.*

Second, once Ray made an unequivocal request for counsel, the police were prohibited from extending the interrogation. Instead, the police engaged in an impermissible effort to persuade Ray to withdraw his request for counsel. The officers intimated that they would be unable to share information freely because of Ray's request for counsel: "Now, we had hoped that we could (inaudible) address some things, we could share some information and you could make a decision about what you weren't going to say or were going to say * * * but we can't do that as long as you have asked for an attorney."

In *Munson*, we concluded that (1) the detectives' references to a "window of opportunity" that would be closing and (2) statements that Munson's "buddies" would be brought in for federal questioning were

both impermissible inducements to waive the right to counsel. 594 N.W.2d at 140–43. Similarly, in *Hannon,* we said that police made impermissible inducements by telling the defendant that if he wanted to talk to an attorney, his side of the story would never be known. 636 N.W.2d at 806. We hold that the admission of testimony concerning Ray's statements after his invocation of the right to counsel was error.

 Both *Munson* and *Hannon* recognize that a determination that a defendant's statements were admitted in error does not end our analysis, because Ray's conviction can stand if the admission of his statements was harmless beyond a reasonable doubt. *See Hannon,* 636 N.W.2d at 807; *Munson,* 594 N.W.2d at 143. "The relevant standard for determining harmless error is whether the jury's verdict is 'surely unattributable' to the error." *State v. Roman Nose,* 649 N.W.2d 815, 823 (Minn.2002) (quoting *State v. Juarez,* 572 N.W.2d 286, 292 (Minn.1997)). In deciding the harmless error issue, we must determine what effect the statement had on the jury in reaching a guilty verdict. *See State v. Day,* 619 N.W.2d 745, 750 (Minn.2000).

Although Ray's statements did not amount to a confession, the state did rely heavily on them to challenge his credibility and to infer his guilt for the murder. The state questioned Sergeant Violette about each of Ray's eighteen assertions that he was not present at the apartment complex on the day of the murder. In its closing argument, the state emphasized these repeated denials. The state stressed that an innocent person would not have needed to lie about his activities. In short, the denials and inconsistencies contained in Ray's statements provided the state with a basis to argue that Ray was lying to cover his own role in the crime.

Apart from Ray's statement, the state's case was weak. The only witnesses who were able to testify that Ray was present at the apartment complex on the day of the shooting were Jackson and her sister. Notably, both witnesses initially told police they did not know the identity of the passenger in the Taurus. Neither the security guard nor Teasley's cousins identified Ray as the passenger. The two nearby residents who saw a man run from the woods did not agree about what the man was wearing, and witness Blake gave alternating descriptions—from a red shirt to a blue shirt, depending on who was asking the question. The only testimony describing the clothing worn by the passenger came from Hicks, who said the passenger had on a blue shirt.

The police did not find the murder weapon. Although the cell phone found at the scene was traced to Ray, there was testimony that it was also used by Gates. The only confrontation with Teasley that was witnessed by others occurred between Gates and Teasley, while Ray remained at the car.

We conclude that Ray's statement had significant evidentiary value to the state. Under these facts, we cannot say that the jury verdict was surely unattributable to the error in the admission of statements made by Ray after his unequivocal request for counsel. Accordingly, a new trial is necessary.

## II.

Ray raises two issues relating to prosecutorial misconduct. First, he contends that the trial court abused its discretion in allowing the prosecutor to elicit inadmissible testimony from Sergeant Violette regarding the state's two-gun theory. Second, he asserts that the prosecutor committed misconduct during closing ar-

gument by suggesting that the jury should judge Ray and many of the witnesses differently because they came from a different environment. Ray contends that this argument made the implicit suggestion that it was appropriate to apply racial considerations to Ray and to the crime.

■ Because we have reversed Ray's conviction and granted a new trial on the grounds that it was prejudicial error to admit parts of his statement, we need not decide whether Ray's claims of prosecutorial misconduct also constitute prejudicial error that would independently warrant a new trial. But we will address those claims to provide guidance to the district court should the state engage in similar conduct in the new trial.

### A. Eliciting Inadmissible Evidence

■ We address first the question of whether the prosecutor committed misconduct by eliciting inadmissible testimony from Sergeant Violette. We recognize that the district court ultimately admitted the evidence. We have held that "[t]he district court has broad discretion in ruling on evidentiary matters and we will not overturn a district court's evidentiary rulings unless appellant shows a clear abuse of discretion and that this abuse resulted in prejudice to him." *State v. Steward,* 645 N.W.2d 115, 120 (Minn.2002). But we are troubled by the state's repeated attempts to elicit testimony that had previously been ruled inadmissible.

Ray made a motion in limine to restrict the proposed testimony of Sergeant Violette regarding the theory that there had been two gunmen. Sergeant Violette had performed an additional search of the scene two days after the shooting. The search did not uncover any new physical evidence. The day before Sergeant Violette was to testify, the state informed de-

fense counsel that it intended to ask Sergeant Violette what his rationale was for going back to the scene to perform a second search. The state explained that Sergeant Violette had received information from a man who claimed that he had heard the sound of two different guns. Defense counsel argued that because the source of this information was unavailable, Sergeant Violette's testimony based on it would be inadmissible hearsay. The court agreed that if the state was pursuing "some sort of a two-gun theory," this would be "very significant hearsay" and would not be allowed.

At trial, the prosecutor asked Sergeant Violette a series of questions about the information he had obtained that suggested that the number of shots fired did not match the expended casings found at the scene. The prosecutor went on to ask the following:

Prosecutor: [Y]ou were also aware that the expended casings and the live round were found in one general location?

Violette: That is correct.

Prosecutor: Does the fact that they were found in one general location, was that also a significant in respect to why you went back up there on the 16th?

Violette: Yeah, the information that I had received was

At this point, defense counsel objected and an off-the-record discussion was held. The defense then withdrew the objection. The prosecutor went on to ask Sergeant Violette if the second search was performed specifically to determine if there was evidence of a second shooter, to which Sergeant Violette replied affirmatively. Defense counsel did not object to this exchange.

At a bench conference a short while later, defense counsel made a record regarding his earlier motion in limine to exclude evidence of Sergeant Violette's hearsay information. Counsel then made a motion for a mistrial based on the fact that the jury had "essentially * * * been allowed to hear that there is a theory that there is more than one shooter." The court denied the motion for a mistrial but offered defense counsel the opportunity to draft a curative instruction. The following curative instruction, as drafted by defense counsel, was read to the jury:

> There has been testimony elicited from Sergeant Violette that he had received information that the sounds of shooting came from more than one position. You are hereby ordered to disregard that portion of Sergeant Violette's testimony.

On redirect, the prosecutor returned to the line of questioning about the disparity between the number of shots reported and the number of spent casings found. He asked Sergeant Violette whether his second search was intended to turn up additional spent casings, to which Sergeant Violette replied "Correct." The prosecutor then asked questions designed to have Sergeant Violette explain the conclusion he reached from his second search, but the objections were sustained. He then tried another tack, asking about eyewitnesses:

> Prosecutor: Now, you were asked about eyewitnesses to the shooting. I want to get into that. There really would have been only three eyewitnesses to the shooting, correct? 

Defense counsel objected on foundational grounds but was overruled. The prosecutor posed his question again, but prior to Sergeant Violette's reply, the district court interjected, asking, "You're talking about based upon the information that he had."

The prosecutor agreed and asked three leading questions to which defense counsel did not object, suggesting that the three eyewitnesses would have been Chauncey Teasley, Coley Gates, and Ray. The prosecutor then asked:

> So, the only ones who would have—could have told you about who fired when and what and all that, answered those questions, answered those—put together that last chapter, would have been one of those three?

No objection was made and Sergeant Violette answered: "That's correct."

Following the district court's order in limine to exclude any information regarding two shooters, Sergeant Violette should have been briefed by counsel to avoid that subject. *See State v. Underwood,* 281 N.W.2d 337, 342 (Minn.1979). The prosecutor not only failed to instruct Sergeant Violette appropriately, he compounded the problem by persistently seeking to elicit the inadmissible testimony and did so by leading questions.

In *State v. Van Wagner,* 504 N.W.2d 746 (Minn.1993), the state repeatedly tried to use a police witness to provide hearsay evidence. This court reversed prophylactically, noting that "[t]he prosecutor is bound to seek that truth which is governed by the rules of evidence * * *." *Id.* at 750. There, we noted that the state's questioning, overall, was simply too pointed and persistent to make an innocent explanation plausible. *Id.* at 750 n. 1. Here, there can be no claim that the inadmissible hearsay was inadvertently mentioned by Sergeant Violette, because all references to it were contained in the prosecutor's leading questions, to which Sergeant Violette only responded in the affirmative. Assuming that there is no basis for the district court to modify its order in limine for the new trial, the state is directed to avoid any efforts to elicit this inad-

missible hearsay evidence.[3] In addition, the prosecutor's concluding question, implying that Ray could have put together the "last chapter" by providing information about the crime is also objectionable as implying that Ray had some obligation to speak or present evidence, in violation of Ray's right to remain silent under the Fifth Amendment.

### B. Improper Closing Argument

We next address Ray's claim that the prosecutor's closing argument was misconduct. We have previously held that "[t]he propriety of a prosecutor's final argument is a matter within the sound discretion of the trial court." *State v. Parker*, 353 N.W.2d 122, 127 (Minn.1984).

During his closing argument, the prosecutor invited the jury to put the evidence "in context, particularly the type of people that presented this evidence to you." He went on to explain that the murder occurred in broad daylight, on a Saturday afternoon, near a busy high rise in North Minneapolis. The prosecutor then stated:

> I would suggest that if this happened in a lot of other neighborhoods, say in Golden Valley, or Edina, or Minnetonka * * * the reaction of the citizenry * * * would be a whole lot different from the reaction of the people in North Minneapolis.
>
> Their reaction basically takes one of two forms. One form, they don't want to be involved. Why? For one of two reasons, either they don't care, they're apathetic or they fear reprisals. I would suggest that if this happened in a neighborhood in Edina, people * ** couldn't get to the phone fast enough to

tell the police what they saw * * * to insure [sic] that this kind of conduct would never happen in their neighborhood ever again. But this is a different environment * * * and it's a challenge for you, because it's not in an environment that most, if not all of you people, are familiar with.

> This is not a dispute between a businessman or a businesswoman from Edina and another businessman or businesswoman from Minnetonka. This is a dispute * * * involving three young black males in the hood in North Minneapolis. This is not your environment, this is the Defendant's environment. So it's a challenge to you to remove yourself from your environment and look at this case and these witnesses in the context of the environment that they come from.

The prosecutor also discussed the criminal background of one of the state's witnesses, saying it was not a surprise that someone from this environment would have criminal convictions. Defense counsel did not object to the state's closing argument.

Ray asserts that the prosecutor's closing argument was an attempt to supply a "race-based" explanation for the states' witnesses and to imply that racial considerations were appropriate in considering Ray's fate. The state counters that the prosecutor's statements were merely designed to forestall attacks by Ray's counsel on the credibility of the state's witnesses.

The state's position would be stronger if the same prosecutor had not previously faced similar challenges, both before this court and the court of appeals. In *State v. Robinson*, 604 N.W.2d 355, 363 (Minn.

---

**3.** We note that defense counsel was somewhat inconsistent in making objections to the inadmissible testimony and, if there were no independent grounds to order a new trial, we would consider whether Ray had waived this claim of prosecutorial misconduct by failing to object timely and consistently. We caution defense counsel to be vigilant in preserving their objections for appellate review.

2000), the defendant argued that there was prosecutorial misconduct in closing argument when the prosecutor reminded jurors that the defendant's world was different from that of a "businessman from Edina, Pope John Paul, and Mother Teresa." We found no misconduct because the comments were isolated and were appropriate to inform the jury about unfamiliar aspects of the drug culture. But in *State v. Brown*, 2000 WL 978756 (Minn.App. July 18, 2000), the same prosecutor compared a Minneapolis minority community unfavorably to the world of Mother Teresa or Pope John Paul. The court of appeals determined that these statements "rose to the level of misconduct" and reversed the conviction. *Id.* at *1.

In a recent decision by this court, in *State v. Varner*, 643 N.W.2d 298 (Minn. 2002), we addressed a situation where a juror made a racial comment to other jurors, stating that an area of Saint Paul was a "miracle mile"—so named because if a white person walked down the street and didn't get beaten or robbed, it was a miracle. *Id.* at 302. In reversing the conviction, we used language that foreshadowed the problem with the prosecutor's argument in Ray's trial:

> In cases where race should be irrelevant, racial * * * considerations, in particular, can affect a juror's impartiality and must be removed from courtroom proceedings to the fullest extent possible * * *. Above all, demeaning references to racial groups compromise the right to a fair trial by inviting jurors to view a defendant as coming from a different community than themselves.

Here, the prosecutor invited the jurors to view the entire occurrence as "involving three young black males in the hood in North Minneapolis," a world wholly outside their own. Such an invitation asks the jury to apply racial and socio-economic considerations that would deny a defendant a fair trial. Such an invitation must be avoided in the new trial.[4]

### III.

Ray raises a number of pro se issues which we also address. He asserts that the state engaged in misconduct by dispatching a deputy to examine trial material he kept in his cell. While we agree that this was misconduct, we also agree with the district court that the state did not obtain any information for use at trial from this activity and, accordingly, no remedy can be given for it on this appeal. Ray also argues that the state improperly elicited testimony that Jackson was afraid of Ray. However, we conclude that this examination was permissible to explain the inconsistencies in Jackson's statements to police and in her prior testimony.

Ray argues that the evidence against him was insufficient to warrant a conviction. We conclude that the evidence against Ray was sufficient for a reasonable jury to conclude that Ray was guilty. *See State v. Landa*, 642 N.W.2d 720, 725 (Minn.2002). We base that conclusion principally upon the presence at the murder scene of the cell phone that had been entrusted to Ray.

Ray also takes issue with a number of evidentiary rulings by the district court, including a denial of a juror's request to view an unredacted transcript

---

4. We again note that defense counsel did not object at trial to the prosecutor's closing argument. We would be concerned if defense counsel were deliberately passing on such an objection with the hope of securing reversible error for appeal and, as a result, getting two chances at a jury trial. We again caution defense counsel that the failure to object to improper closing argument may waive any claim of prosecutorial misconduct on appeal.

of Ray's statement. The decision to allow the jury access to testimony is within the discretion of the district court. *See State v. Lane,* 582 N.W.2d 256, 260 (Minn.1998). Similarly, we decline to hold that the court erred in refusing to allow Ray to present evidence that some third party had committed the crime where the district court determined that the foundation for such evidence was insufficient. Evidentiary rulings such as this rest within the court's discretion and will not be reversed absent a clear abuse of that discretion. *See State v. Stewart,* 643 N.W.2d 281, 292 (Minn. 2002).

■ Ray also contends that he did not receive a speedy trial, but the procedural history of the case makes clear that the delays were the result of defense counsel requests. *See State v. Johnson,* 498 N.W.2d 10, 16 (Minn.1993) (holding that where delays are the result of the defendant's actions, there is no speedy trial violation).

■ Ray argues that the accomplice testimony instruction should have been given because Depring Jackson was eventually charged with the crime of accessory after the fact. Minnesota Statutes § 634.04 (2002) does require that accomplice testimony be corroborated by "other evidence as tends to convict the defendant of the commission of the offense * * *." But, for that section to apply, an accomplice must be a person who "could have been indicted and convicted for the crime with which the accused is charged." *State v. Henderson,* 620 N.W.2d 688, 701 (Minn. 2001). There is no suggestion that Jackson could have been tried for the murder of Teasley. Thus, it was not error to decline to give the accomplice testimony instruction.

Finally, Ray's argument that his counsel was ineffective is rendered moot by our grant of a new trial.

Reversed and remanded for a new trial.