*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-0843**

State of Minnesota,
Respondent,

vs.

Peter Joseph Nayquonabe,
Appellant.

**Filed May 20, 2024
Affirmed
Ross, Judge**

Mille Lacs County District Court
File No. 48-CR-21-2263

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Erica Madore, Mille Lacs County Attorney, Milaca, Minnesota (for respondent)

Christopher B. Sailors, SailorsAllen Law, Milaca, Minnesota (for appellant)

Considered and decided by Bjorkman, Presiding Judge; Ross, Judge; and Larkin, Judge.

**NONPRECEDENTIAL OPINION**

**ROSS**, Judge

A jury found Peter Nayquonabe guilty of fifth-degree criminal sexual conduct after hearing evidence that he misled a woman to drive him to a secluded park and groped her vaginal area over her jeans. Nayquonabe appeals from his conviction, arguing that the state presented insufficient evidence to support his conviction and that the prosecutor committed

four instances of misconduct. Because the victim's testimony and the corroborating evidence sufficiently support the guilty verdict and any prosecutorial misconduct was harmless beyond a reasonable doubt, we affirm.

**FACTS**

The state charged appellant Peter Nayquonabe in November 2021 with fifth-degree criminal sexual conduct. The jury heard evidence of the following events.

Nayquonabe and his wife went to a bar in Onamia at about 12:30 one morning in September 2020. The bartender, whom we will call Brenda in the interest of her privacy, served the couple several alcoholic beverages before Nayquonabe's wife left and drove alone to the couple's home two-and-a-half blocks away. Nayquonabe remained at the bar, saying he wanted to walk home. After his wife left, Nayquonabe and Brenda began conversing and having drinks.

Brenda closed the bar at 1:54 a.m. and offered to give Nayquonabe a ride home. But Brenda had recently moved to Onamia from Wisconsin, so she asked Nayquonabe to enter his home address into a mapping application on her cell phone. Nayquonabe instead routed them to a secluded park.

Brenda followed the directions and realized that Nayquonabe had led them to a park rather than to his home. She stopped the car on the side of the road and urged him to give her his correct address. Nayquonabe instead began touching Brenda's "groin and vaginal area" over her jeans. Brenda immediately told him, "No," and tried to push him off. Nayquonabe persisted, telling Brenda, "You know what this is." He asked her why she didn't find him attractive. He continued attempting to touch Brenda's genital area, and she

2

continued to push him away. Brenda exited the car. Eventually, Nayquonabe gave her the actual directions to his house, and Brenda drove him home. Brenda immediately telephoned her mother and told her about the assault.

Nayquonabe's counsel cross-examined Brenda to highlight inconsistencies between her testimony and her statements to police. One inconsistency involved the amount of alcohol she consumed. She told police that she had two beers and two shots with Nayquonabe, but she testified that she had consumed one beer and one shot with him. Another inconsistency involved the duration of Brenda's encounter with Nayquonabe after they left the bar. Brenda had testified that Nayquonabe's groping occurred over a 30-minute period, but a surveillance video at the bar indicates that they left at 1:54 a.m. and that her telephone call to her mother occurred at 2:09 a.m. And another inconsistency involved a detail about what Nayquonabe did with Brenda's cell phone during the incident. She had told police that he took her phone and placed "it near his area" in the car, but she testified that he tossed it onto the backseat. Nayquonabe's attorney also emphasized for the jury that Brenda had referred to Nayquonabe's wife as his "girlfriend."

The jury saw and heard the body-camera video and audio footage recorded when a police investigator spoke with Nayquonabe at his home about the incident. They heard Nayquonabe admit that he had gotten a ride home from Brenda but claim that he could not remember whether they had stopped anywhere before they reached his house.

Before the trial began, the state had successfully moved the district court to preclude the parties from commenting "on the possible effect of a conviction on [Nayquonabe's] job or any consequences that would come to him as a result of the conviction." But while

3

Nayquonabe testified in his defense, he said that he is "the Commissioner of Administration for the Mille Lacs Band of Ojibwe" and that he oversees between "750 to 1,000 staff at any given point during the year." The prosecutor then cross-examined Nayquonabe about this employment:

PROSECUTOR: And, in fact, this allegation, if it were proven, has some consequences for you; isn't that right?

NAYQUONABE: Well, I think any allegation has consequences for anybody, but, yes, it does.

PROSECUTOR: Specifically for you and your employment there would be a consequence; is that true?

NAYQUONABE: Yeah. There would be.

PROSECUTOR: Okay. You could lose your position.

NAYQUONABE: Yeah, I could.

PROSECUTOR: Okay. That's concerning.

NAYQUONABE: Well, it's concerning. I mean, I love my job, but I also have an education, and if I need to provide for my family I'll get another job.

The jury found Nayquonabe guilty of fifth-degree criminal sexual conduct. Nayquonabe unsuccessfully moved the district court to order a new trial based on alleged prosecutorial misconduct. The district court sentenced him to 365 days in jail, staying execution of 305 days.

Nayquonabe appeals.

**DECISION**

Nayquonabe raises two arguments to challenge his conviction. He contends first that the evidence was not sufficient to support his conviction. He contends second that the prosecutor unfairly elicited testimony excluded by the district court's pretrial order,

4

improperly asked a "were they lying" question, belittled his defense, and injected race into her arguments. The contentions do not lead us to reverse.

**I**

We are not persuaded by Nayquonabe's argument that the state presented insufficient evidence to prove he engaged in fifth-degree criminal sexual conduct. On a claim of insufficient evidence, we view the record in the light most favorable to the jury's verdict and determine whether the state's evidence allowed the jury to find the defendant guilty. *State v. Horst*, 880 N.W.2d 24, 40 (Minn. 2016). We do so assuming that the jury credited the state's witnesses and discredited any contrary evidence. *State v. Friese*, 959 N.W.2d 205, 214 (Minn. 2021). We hold that the evidence supports the verdict.

The jury could find Nayquonabe guilty of fifth-degree criminal sexual conduct if he "engage[d] in nonconsensual sexual contact," which includes "the intentional touching by the actor of the complainant's intimate parts" or "the clothing covering the immediate area of the intimate parts." Minn. Stat. §§ 609.3451, subd. 1(1), 609.341, subd. 11(i), (iv) (2020). Brenda's testimony alone, which we know from the verdict that the jury believed, could support the guilty verdict. A conviction may rest even on "the uncorroborated testimony of a single credible witness," *State v. Hill*, 172 N.W.2d 406, 407 (Minn. 1969), and a criminal-sexual-conduct victim's testimony does not require corroboration, Minn. Stat. § 609.347, subd. 1 (2020). Nayquonabe nevertheless challenges his conviction on the theory that Brenda's testimony was so lacking in credibility that it needed corroboration.

Nayquonabe bases his argument on *State v. Ani*, an opinion in which the supreme court contemplated the possibility of a circumstance in which the lack of evidence

corroborating a victim's testimony might require holding that the evidence is insufficient to sustain a conviction. 257 N.W.2d 699, 700 (Minn. 1977). *Ani*'s contemplated possibility seems problematic given the standard of review requiring us to assume that the jury believed the victim's testimony and disbelieved all competing evidence. That is, it is difficult to imagine a case in which a complainant testified that she was the victim of a sexual assault and the jury believed her testimony, but we nevertheless deem the evidence insufficient to support the guilty verdict. Indeed, we expressly described *Ani*'s possibility statement as mere dictum. *State v. Folley*, 378 N.W.2d 21, 25 (Minn. App. 1985). And in the 20 or so cases we have found in which the supreme court has cited *Ani* for having made that statement, none relied on it to reverse a defendant's conviction. *See, e.g.*, *State v. Foreman*, 680 N.W.2d 536, 538–39 (Minn. 2004) (citing *Ani*'s possibility statement but affirming the conviction based only on victim's uncorroborated testimony); *Dale v. State*, 535 N.W.2d 619, 624 (Minn. 1995) (citing the *Ani* statement, noting the presence of corroborating evidence, and concluding, "this is not such a case"); *State v. DeBaere*, 356 N.W.2d 301, 304 (Minn. 1984) (affirming conviction based on corroborated testimony); *State v. Dornack*, 329 N.W.2d 839, 839–40 (Minn. 1983) (same); *State v. Gardner*, 328 N.W.2d 159, 160 (Minn. 1983) (same); *State v. Nelson*, 326 N.W.2d 917, 918 (Minn. 1982) (same); *State v. Wrightington*, 323 N.W.2d 793, 794–95 (Minn. 1982) (same). Nayquonabe has identified no case, and we have found none, that would justify abandoning our deference to the jury's credibility-based reliance on a complainant's testimony that the defendant sexually assaulted her.

We add that the jury also received evidence corroborating Brenda's testimony, including the video footage of Brenda and Nayquonabe leaving the bar together. More significantly, jurors received evidence tending to discredit Nayquonabe's denials. That evidence included the video footage of the police officer's interview of Nayquonabe soon after Brenda's report and Nayquonabe's failed attempt at an alibi at trial.

Jurors watched the video footage of the police officer's interview of Nayquonabe soon after Brenda's report. With it, the jury could juxtapose Brenda's trial testimony of the assault against Nayquonabe's contemporaneous denial, weighing each one's credibility against the other. In that video, jurors first saw Nayquonabe immediately state accurately, clearly, succinctly, and without hesitation the sequence of key events of the previous night: he went to the bar, he drank, his wife left before him, and, although he usually walks from the bar, the bartender gave him a ride home. But then they saw him pause when the officer asked whether he and Brenda had stopped anywhere during the drive from the bar to his house—a drive that every juror knew could be completed in mere seconds, given the roughly two-block distance. And they watched him stumble and ramble when he answered that simple, yes-or-no question: "I don't think--; I--; you know, really, I don't know. I don't remember. Um, so I was, but, as far as I know, we came right here, yeah." Asked again whether they drove straight from the bar to his house, he answered, "Best I can remember, I mean, I don't--." His purportedly fuzzy memory then seemed to resharpen, as he soon declared unequivocally, "Nothing inappropriate happened between me and—I don't even know her name." But then jurors watched him struggle again to answer another yes-or-no question, this time directly about his conduct: "I'll be blunt. Did you touch this person's

7

leg or anything like that?" Nayquonabe replied, "Not that I know. I wouldn't—I would not do that. I'm not a . . . I'm not a pushy type of male like that. I'm not." Viewing the interview footage in the light most favorable to the verdict, we infer that it provided a reasonable basis for jurors to believe Brenda's accusation and disbelieve Nayquonabe's fudgy denial.

Jurors had an additional reason to doubt Nayquonabe's denial based on his attempt to suggest that he was already at home at the time of the alleged assault. He presented to the jury a screenshot purporting to show his cell phone's location at 1:42 a.m. to be at his house. But this attempted alibi faltered in the face of the surveillance footage, which proved that he was still at the bar until 1:54 a.m. Assessing this evidence also in the light favoring the guilty verdict, we infer that the jury interpreted it to find Nayquonabe's denial incredible.

And given our standard of review, we are not persuaded to a different result by inconsistencies between Brenda's testimony and her statements to police. Her statements and testimony never wavered on the key circumstances that she and Nayquonabe left the bar together, that Nayquonabe mapped them to a secluded park, that Nayquonabe groped her, and that, despite her telling him no, Nayquonabe continued to make advances. That Brenda called Nayquonabe's wife his "girlfriend," stated a different location where Nayquonabe put her phone, and quantified differently the amount of time involved or the number of drinks she had with Nayquonabe, have no bearing on the elements of the offense. They are, in context, insignificant inconsistencies that say nothing relevant about Brenda's credibility. They offer no basis for us to usurp the jury's essential fact-finding role in the face of competing accounts.

8

Nayquonabe unconvincingly attempts to liken this case to *State v. Huss*, 506 N.W.2d 290 (Minn. 1993). The *Huss* court reversed a criminal-sexual-conduct conviction because the child victim's testimony "was contradictory as to whether any abuse occurred at all." 506 N.W.2d at 292. No such inconsistency occurred here. The child victim in that case spoke for almost an hour before alleging sexual abuse, answered in the negative as to whether she had any "yucky secrets," and labeled hugs and touches to her hair as "yucky secrets." *Id.* And it was the victim's mother's exposing the child to the highly suggestive book *Secrets* that tipped the scale to require reversing the defendant's conviction. *Id.* ("[E]ven given this contradictory testimony, we might not be persuaded to reverse absent the repeated use of a highly suggestive book on sexual abuse."). By contrast to the extreme example of inconsistent testimony and suggestive influence in *Huss*, Brenda's account of Nayquonabe's sexual misconduct was steadfast: he misled her to the park and groped her. We hold that the state presented sufficient evidence to support Nayquonabe's conviction of fifth-degree criminal sexual conduct.

## II

Nayquonabe argues that he is entitled to a new trial because the prosecutor engaged in misconduct during cross-examination and closing arguments. Nayquonabe identifies four grounds requiring reversal. He argues that the prosecutor elicited testimony precluded by a motion *in limine*, belittled his arguments, asked a "were they lying" question, and injected race into the arguments. None of his assertions entitle him to a new trial.

**Any objected-to instances of misconduct either do not constitute misconduct or were harmless beyond a reasonable doubt.**

Nayquonabe asserts two instances of objected-to prosecutorial misconduct: the prosecutor elicited testimony prohibited by the district court's pretrial order and the prosecutor belittled his defense. We start with his contentions regarding the prosecutor's eliciting inadmissible evidence during the cross-examination we recounted above about the employment consequences that Nayquonabe might face from the allegations.

The parties dispute whether Nayquonabe objected to the state's questioning at trial and which standard of review guides our analysis. We need not resolve that dispute because Nayquonabe's challenge fails under even the more favorable test applied to alleged objected-to serious misconduct. *See State v. Caron*, 218 N.W.2d 197, 200 (Minn. 1974) (stating that the two-tiered harmless-error test applies to cases where the defendant objects to the alleged prosecutorial misconduct). Under that test, in cases involving "unusually serious prosecutorial misconduct," we determine "whether it was harmless beyond a reasonable doubt." *State v. Martin*, 773 N.W.2d 89, 104 (Minn. 2009). And in cases involving less serious misconduct, we determine whether the misconduct likely played a substantial part in influencing the jury to convict. *Id.* We review Nayquonabe's challenge under that framework.

The state concedes that the prosecutor committed misconduct by asking Nayquonabe about the effects of a conviction on his employment. The concession is well founded. A prosecutor engages in misconduct by attempting to introduce evidence previously ruled inadmissible by the district court. *See State v. Ray*, 659 N.W.2d 736, 744–

10

46 (Minn. 2003). Because the district court granted the state's motion *in limine* precluding the parties from referencing the consequences of a conviction on Nayquonabe's employment, the prosecutor committed misconduct by eliciting the testimony. We next consider whether that misconduct violated Nayquonabe's right to a fair trial.

The parties dispute which harmless-error review applies. We again decline to reach the issue and conclude that, even assuming that the more favorable, harmless-beyond-a-reasonable-doubt standard applies, the state has shown that Nayquonabe is not entitled to a new trial. Under that standard, a prosecutor's misconduct is harmless if the jury's verdict was "surely unattributable" to the misconduct. *State v. Nissalke*, 801 N.W.2d 82, 106 (Minn. 2011). Courts consider various factors when making this determination, including how the improper evidence was presented, whether the prosecutor emphasized it, whether it is highly persuasive evidence, and whether the defendant countered it. *State v. Wren*, 738 N.W.2d 378, 394 (Minn. 2007). We hold that the prosecutor's misconduct was harmless beyond a reasonable doubt.

Nayquonabe contends that, because the impermissible questioning went toward his credibility, and because credibility was a central issue at trial, the prosecutor's misconduct was not harmless beyond a reasonable doubt. Although credibility was an important issue, the prosecutor's questioning was not highly probative of the issue. As we explained above, the jury had ample grounds to question the truthfulness of Nayquonabe's testimony. We add that, even if the prosecutor's questioning was highly probative, the district court's instructions to the jury addressed the concern: "[Y]ou're not to consider the possible penalties. That consideration is the responsibility of the Court exclusively. Your only duty

is to determine whether . . . or not the guilt of the defendant has been proved beyond a reasonable doubt without reference to any possible penalty which may accrue." We presume that the jury followed those instructions. *State v. Pendleton*, 706 N.W.2d 500, 509 (Minn. 2005). And Nayquonabe not only countered the prosecutor's impermissible questioning, but he also incorporated it into his redirect-examination and closing argument: "I'm glad [the state] talked about Mr. Nayquonabe's job," contended Nayquonabe's trial counsel. He then told the jury that "untrue allegations don't just affect the person, they affect an entire family. They affect a career. They can take down people for things they didn't do." For all these reasons, we conclude that the prosecutor's misconduct was harmless beyond a reasonable doubt.

Nayquonabe also contends that he is entitled to a new trial because the prosecutor belittled his defense. During closing argument on rebuttal, the prosecutor told the jury:

> [Brenda] didn't want to be here to testify about what happened. She didn't want to tell the officers in the first place. It's humiliating. It's frightening. And having to come back after two years to revisit it again, having a defense attorney *constantly snapping in your face* about whether or not what you said --.

(Emphasis added). Nayquonabe argues that the "snapping in your face" remark disparaged his defense, constituting misconduct. The argument fails. Prosecutors may argue that a particular defense lacks merit but cannot belittle the defense or categorically disparage that type of defense. *See State v. Peltier*, 874 N.W.2d 792, 804 (Minn. 2016). The prosecutor's comments here neither belittled nor categorically disparaged Nayquonabe's defense. The prosecutor instead argued colorfully to support Brenda's credibility, responding to

Nayquonabe's counsel's extensive cross-examination attacking inconsistencies in her testimony. The prosecutor's comments do not constitute misconduct. Nayquonabe is not entitled to a new trial on either alleged instance of objected-to prosecutorial misconduct.

**Any unobjected-to instances of alleged prosecutorial misconduct were not misconduct.**

Nayquonabe alleges two instances of unobjected-to prosecutorial misconduct: the prosecutor's asking a "were they lying" question and injecting race into her closing argument. We review unobjected-to misconduct under the modified plain-error test. *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006). That test requires Nayquonabe to first show that an error occurred and was plain. *Id.* Errors are plain if they "contravene[] case law, a rule, or a standard of conduct." *Id.* If Nayquonabe meets this burden, the burden shifts to the state to prove that the misconduct did not affect Nayquonabe's substantial rights. *Id.* If both parties meet their burden, we consider reversing if addressing the error is necessary "to ensure fairness and the integrity of the judicial proceedings." *State v. Davis*, 735 N.W.2d 674, 682 (Minn. 2007) (quotation omitted). We hold that neither unobjected-to incident constitutes misconduct.

Nayquonabe first argues that the prosecutor's asking the jury "why would [Brenda] lie" constitutes a "were they lying" question. But "were they lying" questions are those that ask a defendant whether another witness's testimony was accurate. *State v. Pilot*, 595 N.W.2d 511, 516 n.1 (Minn. 1999). That type of question is prohibited because it "calls for improper comment on another witness'[s] testimony," and it is solely the "province of the jury to determine the credibility of witnesses." *Id.* at 516. The state's rhetorical question

13

here was instead a simple argument directly inviting the jury to believe Brenda, implicitly contending that she lacked any motive to lie. It does not constitute misconduct.

It is true, as Nayquonabe contends, that parties may not inject race into their arguments unless race is relevant. *Ray*, 659 N.W.2d at 747. "[R]acial considerations, in particular, can affect a juror's impartiality and must be removed from courtroom proceedings to the fullest extent possible." *State v. Varner*, 643 N.W.2d 298, 304 (Minn. 2002). We are satisfied that the contested argument did not improperly include race:

> Look at [Brenda]. The interesting thing about [Brenda] is that, really, she has nothing to gain from today's case. She's not a Minnesota resident, certainly not an Onamia resident. She lives in Wisconsin. She's not coming back. She's not employed here. She's not a member of the Mille Lacs Band. She doesn't have any affiliation with Mr. Nayquonabe.

Contrary to Nayquonabe's contention, that the prosecutor told the jury that Brenda was not a Mille Lacs Band member does not generally refer to Nayquonabe's race as a Native American or constitute an irrelevant ethnic characterization. Nayquonabe testified that he is the "Commissioner of Administration for the Mille Lacs Band of Ojibwe." In context, the contested reference is one in the list of ways Brenda is not at all connected to Nayquonabe; she is not affiliated with his city "Onamia," his state "Minnesota," or his community "Mille Lacs Band." The prosecutor was arguing that Brenda had no relational reason to testify falsely and that the jury should therefore credit her testimony. We reject the contention that the reference improperly injected race into the argument.

Nayquonabe adds a final argument, which is that the cumulative effect of the prosecutor's misconduct warrants a new trial. Having determined that the prosecutor

committed only one instance of misconduct and that the misconduct was harmless beyond a reasonable doubt, his cumulative-effect argument necessarily fails.

**Affirmed.**