**STATE of Minnesota, Respondent,**

**v.**

**Christopher Fausto CABRERA, Appellant.**

**No. A04–1306.**

Supreme Court of Minnesota.

July 28, 2005.

Robert D. Miller, Stephan V. Grigsby, Minneapolis, MN, for Appellants.

Michael A. Hatch, Minnesota Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, David Craig Brown, Assistant County Attorney, Minneapolis, MN, for Respondents.

## OPINION

BLATZ, Chief Justice.

On February 4, 2004, appellant Christopher Fausto Cabrera was found guilty of first-degree murder while committing a drive-by shooting, second-degree intentional murder, and four counts of attempted first-degree murder under Minn.Stat. §§ 609.185(a)(3); 609.19, subd. 1(1); and

609.17 (2004). In addition to raising several pro se issues, appellant argues on appeal that multiple instances of prosecutorial misconduct during closing argument warrant reversal of his conviction. Appellant's chief claim is that the prosecutor improperly injected race into the closing argument. We reverse and remand.

At approximately 12:00 a.m. on June 22, 2003, appellant went to Stardust, a bar and bowling alley in Minneapolis. He was accompanied by his friend, Tywon Beasley, who was also appellant's girlfriend's brother. While at Stardust, appellant was involved in a verbal and physical confrontation with Gwendolyn Carter. Carter was at the bar with her boyfriend, Antoin Crawford; her brother, Terrance Ringgold; his girlfriend, Tavona Johnson; and a cousin, George Grant. The confrontation between appellant and Carter began when appellant walked across the bar and "[felt] someone's eyes on him." He made eye contact with Johnson, walked up to her, and handed her his business card. Carter, who was standing near Johnson, felt someone touch her buttocks. When Carter turned around to see who had touched her, she found appellant standing behind her, and they began arguing.

During the argument, Carter grabbed appellant's ponytail and refused to let go. Sergeant Andrew Schmidt and Officer David Campbell, two uniformed Minneapolis police officers working off-duty at the bar, attempted to break up the fight, but Carter did not let go of appellant's ponytail until the officers sprayed a chemical irritant at the group.

Sergeant Schmidt then asked appellant, Beasley, Carter, and the members of Carter's group to leave Stardust. Sergeant Schmidt followed them out of the bar to the parking lot where he observed them get into their two separate vehicles and then drive out of the parking lot. With appellant in the passenger seat, Beasley drove a teal-green truck out of the parking lot. Soon after the truck exited, Carter's group left the parking lot in a blue Caprice driven by Grant.

Carter, who was sitting in the front passenger seat of the car, testified at trial that shortly after leaving the Stardust parking lot, she felt a sharp pain and heard screaming from the back seat of the car. She then looked out the window of the Caprice and saw appellant leaning out the window of a truck with a gun in his hand, firing at the Caprice. Grant testified that he stopped the car at a red light when he heard a "pop, pop, pop" sound and "heard the bullets buzzing through." He "let off the brake" and, swerving to the side of the road, saw appellant leaning out the window of a moving truck while firing a gun at the car.

After Grant stopped the Caprice, Crawford, who was sitting in the back seat of the car, got out and ran back to Stardust to get the off-duty police officers who had broken up the fight earlier. When Sergeant Schmidt and Officer Campbell arrived, Ringgold, who had been shot in the head, was already dead. Carter had been hit in the chest by a bullet, required emergency surgery, and ultimately lost her spleen. Grant and Crawford had also sustained gunshot wounds. Johnson was the only passenger in the car who was not shot. At the scene, the police recovered eight 9mm shell casings.

Appellant and Beasley fled the scene of the crime. Over the course of the next few hours they spent time with Adele Barrow, the mother of Beasley's children; Beasley's parents; and Beasley's girlfriend. Barrow testified at trial that appellant told her the night of the shooting that he "got in a fight at Stardust and they left and somebody started shooting or—it was shots fired." He also told her that

"he messed up and somebody got shot" and that "he fired shots."

After a few minutes at Barrow's home, Beasley and appellant left and went to Beasley's parents' house where Beasley's father, John Harris, was present. Harris testified at trial that appellant told him about the incident at Stardust and said that Beasley "didn't have anything to do with it." Harris also said that appellant told him he felt his "life was threatened twice and [he] was scared so [he] shot."

Later the same morning, Beasley and appellant went to the home of Lavenia Gaines, Beasley's girlfriend. Testifying for the state, Gaines stated that appellant and Beasley came to her house in the early morning hours of June 22, 2003, and that she and appellant had a conversation about the Stardust incident. According to Gaines, appellant told her that he got in a fight at the bar and "said that he felt bad about what happened and that it was all on him."

In the days following the shooting, appellant had his teal-green truck painted black and the end-gate removed. After seeing a television news report that played a surveillance video taken at Stardust on the night of the incident, appellant fled "up north" and then took a bus to Texas. After spending approximately one week in Texas, appellant returned to Minnesota and turned himself in to the authorities. Between the time of the shooting and trial, appellant changed his appearance by cutting off his ponytail, shaving his face, and wearing glasses.

Prior to appellant's trial, Beasley pleaded guilty to aiding an offender after the fact for his role in the shooting. Beasley testified for the state at trial. According to Beasley, he drove the truck out of the Stardust parking lot and was still driving when appellant fired several shots out the front passenger-side window. Beasley's testimony was corroborated by the testimony of two of the victims, Grant and Carter, who both identified appellant as the person who shot at them from a truck after they left the Stardust. Beasley's testimony was further corroborated by Barrow, Gaines, and Harris who all testified that, within hours of the incident, appellant told them he was the shooter. In addition, appellant's uncle, Warren Swanson Jr., testified that he had bought appellant a 9mm handgun several months prior to the shooting.

After the state rested, appellant testified in his own defense. According to appellant, he lent Beasley his 9mm handgun several months before the shooting and Beasley never returned it. Appellant testified that after leaving the Stardust parking lot, he and Beasley switched seats in the truck and appellant was driving when Beasley unexpectedly fired the gun out of the front passenger window. After appellant heard shots, he looked at Beasley in the passenger seat. Beasley had the gun on his lap—pointed in appellant's direction—with his finger still on the trigger. Appellant further testified that he did not have conversations with Barrow, Gaines, or Harris in the hours following the shooting and he denied telling them that he was the shooter. Finally, appellant testified that he did not notify the police after the shooting because he was afraid of Beasley and that he was aware at the time of the shooting that Beasley had been in a gang.

In addition to placing the blame on Beasley, appellant's primary defense strategy was to attack the credibility of the state's witnesses. This strategy was evident from the defense's opening statement, examination of the witnesses, and closing argument. For example, when cross-examining the state's witnesses, the defense asked them questions about their

relationships with Beasley, their prior convictions, and prior inconsistent statements. The defense also questioned the state's three witnesses regarding their knowledge relating to or involvement with gangs. First, the defense asked Sergeant Schmidt, who had worked on a gang strike force, whether he recognized any of the people involved in the altercation at Stardust. Before Sergeant Schmidt answered the question, the state objected and, after a bench conference, the trial court stated on the record that defense counsel should continue the cross-examination of Sergeant Schmidt, but "without any reference to gangs." Second, during cross-examination of Beasley, the defense elicited that Beasley used to be a member of the Crips gang and had gang tattoos on his body that were visible during the fight at Stardust. Finally, both the state and the defense elicited testimony from Crawford about his past involvement with gangs. In response to questions by the state, Crawford testified that he had been in a gang, but was no longer involved with gangs and that the shooting was unrelated to gang activity. In response to the defense's questions about Crawford's gang-related tattoos, Crawford admitted that his gang tattoos were visible during the fight at Stardust. Implicit in the defense's cross-examination of these three witnesses was that gang rivalry played a role in the shooting.

The defense continued its focus on the credibility of the state's witnesses during closing argument. The closing argument of the defense wove together parts of the witnesses' actual statements and appellant's own testimony in an attempt to cast reasonable doubt on appellant's guilt. Specifically, the defense noted Beasley's and Crawford's gang affiliations, stating:

> I submit to you that if truth be told, [the state is] asking you to subscribe and believe gang members.

* * * *

You heard from Crawford. Gang Member.

* * * *

What do we know about Mr. Beasley? Gang Member. We know he's a tough looking guy, big guy. We know he's got a criminal history. And I submit to you that violence—he's no stranger to violence. He's intimidating and he's dangerous.

After deliberating, the jury found appellant guilty of first-degree murder by drive-by shooting, second-degree intentional murder, and four counts of attempted first-degree murder. The jury acquitted appellant of first-degree premeditated murder.

On appeal, appellant claims that the prosecutor committed misconduct in his closing argument by: (1) impermissibly injecting race into the trial; (2) commenting on appellant's opportunity to hear the testimony of all the other witnesses before testifying; (3) offering public policy explanations regarding why first-degree murder by drive-by shooting does not require premeditation; (4) personalizing the victim; and (5) demeaning the defense. In his pro se supplemental brief, appellant also argues that the state failed to disclose the criminal history of two state witnesses, that the prosecutor vouched for a witness in closing argument, and that the cumulative effect of the errors denied him a fair trial.

 We begin by addressing appellant's claim that the prosecutor's improper injection of race into his closing argument constituted serious prosecutorial misconduct. When faced with serious prosecutorial misconduct, we reverse unless the misconduct was harmless beyond a reasonable doubt. *See State v. Roman Nose*, 667 N.W.2d 386, 401 (2003); *State v. Caron,*

300 Minn. 123, 127–28, 218 N.W.2d 197, 200 (Minn.1974). Such misconduct is harmless beyond a reasonable doubt "[i]f the verdict actually rendered was surely unattributable to the error." *State v. Ashby,* 567 N.W.2d 21, 28 (1997).

Appellant claims that the prosecutor's following statement, made during closing argument, constituted serious misconduct:

> Prosecutor: Now, the defense case in addition to the—in addition to just throwing mud on young black men and saying that they're—if they're young black men they must be in gangs—
>
> Defense: Objection, Your Honor. It was never our contention to be racist in this case.
>
> Court: Overruled. It's argument.

Appellant argues that the prosecutor committed additional misconduct during its rebuttal following appellant's closing argument when the prosecutor stated:

> Finally, the other thing you didn't hear in the courtroom, other than counsel who apparently is an expert on gangs, you heard nothing about gangs. You heard nothing about gangs other than what came from the State's witnesses telling about their past association and some wild and, I submit, racist speculation on the part of counsel here, that because these men who happen to be black are in—have been in gangs in the past, despite their testimony about trying to get on with their lives, that they are people to be feared, they're rough characters. Well, we know what that's a code word for. He's a big, strong black man, but he's a rough character.
>
> Members of the Jury, this is not about race.

The defense objected to this statement, but was again overruled by the trial court.

■ We have said that it is improper to inject race into a closing argument when race is not relevant. *State v. Ray,* 659 N.W.2d 736, 747 (Minn.2003); *see also State v. Varner,* 643 N.W.2d 298, 304 (Minn.2002). The state argues, however, that the prosecutor in this case did not improperly inject race into the closing argument because "the defense injected the issue of gangs, and by implication race, into the trial." We disagree. In our view, the record does not support the state's assertions that the defense was engaging in "wild" "racist speculation" by referring to the witnesses' gang associations. Rather the defense's statements were based on testimony elicited at trial regarding Beasley's and Crawford's gang affiliations. Further, defense counsel's statement during closing argument that Beasley was "intimidating" and "dangerous" was relevant to and supported by appellant's testimony that he did not report the shooting because of his fear of Beasley.

Appellant's defense was that Beasley was the shooter, that the state's witnesses were not to be believed, and that, based on the witnesses' admitted past gang membership, gang rivalry possibly played a role in the shooting. The defense never mentioned the race of a witness or even implied that race was a factor in this case during his examination of witnesses or in closing argument. Moreover, the defense made timely objections to the prosecutor's improper statements.

In *State v. Ray* we stated that the failure to object to improper closing argument may waive a claim of prosecutorial misconduct on appeal and that we "would be concerned if defense counsel were deliberately passing on such an objection with the hope of securing reversible error for appeal." 659 N.W.2d at 747 n. 4. In the instant case, the defense properly objected to the prosecutor's improper statements, but was erroneously overruled. Working in tandem, the improper argument and the

court's ruling may have led the jury to conclude that defense counsel himself was racist—an implication wholly unsupported by the record.

■ The prosecutor is a "minister of justice" whose obligation is "to guard the rights of the accused as well as to enforce the rights of the public." *State v. Salitros,* 499 N.W.2d 815, 817 (Minn.1993) (quoting I *ABA Standards for Criminal Justice,* The Prosecution Function 3–1.1 and commentary at 3.7 (2d ed.1979)); *see also State v. Henderson,* 620 N.W.2d 688, 701–02 (Minn.2001) ("Prosecutors have an affirmative obligation to ensure that a defendant receives a fair trial."). We believe that within the context of the record before us, the prosecutor's allegation that defense counsel was engaging in "racist speculation" was incorrect and undermined the prosecutor's obligation to ensure that the defendant received a fair trial. We must—and do—take such allegations very seriously. It was up to the jury to judge the weight and credibility of the witnesses' testimony. The jury should have been free to accept or reject the testimony without the suggestion by the state that the defense theory amounted to "racist speculation." Accordingly, we conclude that the prosecutor's statements injecting race into closing argument were serious prosecutorial misconduct.

■ Our conclusion that serious prosecutorial misconduct occurred does not end our inquiry. We must also decide whether the verdict was unattributable to the error. *See Ashby,* 567 N.W.2d at 28. Given the strength of the evidence in this case—Beasley's testimony, both eyewitnesses' identifications, and appellant's admissions—it would be difficult for us not to

conclude that the prosecutor's comments were harmless beyond a reasonable doubt. Nonetheless, as we stated in *Varner,* "[t]he issue of racial or ethnic bias in the courts * * * is an issue that must be confronted whenever improperly raised in judicial proceedings." 643 N.W.2d at 305. We believe that these words apply in full force to the case at hand.

■ Bias often surfaces indirectly or inadvertently and can be difficult to detect. We emphasize, nonetheless, that the improper injection of race "can affect a juror's impartiality and must be removed from courtroom proceedings to the fullest extent possible." *Id.* at 304. Affirming this conviction would undermine our strong commitment to rooting out bias, no matter how subtle, indirect, or veiled. Accordingly, in the interests of justice and in the exercise of our supervisory powers, we reverse appellant's conviction and remand for a new trial.[1] *See Salitros,* 499 N.W.2d at 820 (reversing the conviction prophylactically in the exercise of the court's supervisory power and in the interests of justice); *State v. Kaiser,* 486 N.W.2d 384, 387 (Minn.1992) (same); *see also State v. Glaze,* 452 N.W.2d 655, 662 (Minn.1990) (concluding that a new trial was not warranted but emphasizing that "[p]rosecutors are officers of the court * * * and we will not hesitate in a suitable case to grant relief in the form of a new trial").

Reversed and remanded.

---

1. Because we are reversing and because the additional claims of prosecutorial misconduct were not objected to at trial, we decline to resolve whether the remaining allegations of prosecutorial misconduct constituted plain error. Finally, given the disposition of this case, we do not address appellant's pro se claims.