**STATE of Minnesota, Respondent,**

v.

**Leroy R. PAUL, Appellant.**

**No. A05–789.**

Supreme Court of Minnesota.

June 22, 2006.

---

Ann McCaughan, Office of State Public Defender, Minneapolis, MN, for Appellant.

Michael A. Hatch, State Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, MN, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

On January 21, 2005, a Hennepin County jury found appellant, Leroy Roderick Paul, guilty of first-degree felony murder during a drive-by shooting and second-degree felony murder for the November 7, 2002, shooting death of Fred Williamson. The jury acquitted Paul of first-degree premeditated murder. The district court sentenced Paul to life in prison for first-degree felony murder during a drive-by shooting. Paul raises two issues on appeal: (1) the court erred when it denied his motion to suppress evidence of his custodial interrogation; and (2) he is entitled to a new trial based on alleged prosecutorial misconduct during closing argument. We affirm.

The legal issues before us focus on Paul's custodial interrogation and the state's closing argument, but a summary statement of the facts is necessary to pro-

vide the context in which these issues arise. The night before Fred Williamson was killed, appellant Leroy Roderick Paul and his friend Kenneth Spencer spent the evening at a nightclub and then drove in Spencer's black Chevrolet Tahoe to the north Minneapolis home of a woman they had met at the club. The following morning, Paul drove in Spencer's Tahoe to attend a pretrial hearing on an unrelated matter. Paul met his girlfriend, Kesha Dent, at the courthouse, and after the hearing the two drove in the Tahoe to a north Minneapolis café. After they parked in front of the café, Paul and Dent encountered Williamson, Bryan Herron, and Antonio Wilson, all of whom had just finished breakfast and were walking toward their vehicle, a Chevrolet Cavalier. Paul and Williamson had been friends for years, but had recently had a falling out. Williamson's friend, Herron, had also been friends with Paul, and Herron had a child with—and was engaged to—Paul's sister. Herron ultimately became a key prosecution witness at Paul's trial.

Williamson approached Paul and the two men got into an argument. Herron testified that during this confrontation, Paul drew a .40 caliber gun out of the waistband of his pants, put a bullet in the chamber, and then put the gun at his side, but did not point it at anyone. Wilson testified that he did not see Paul with a gun during this confrontation. Dent testified that while Paul and Williamson argued, she walked into the café and ordered food for herself and Paul.

After a few minutes, Williamson, Herron, and Wilson walked across the street and got into the Cavalier. Herron drove, Williamson rode in the front passenger seat, and Wilson rode in the back seat behind Williamson. While they were driving, Williamson, still agitated from the argument with Paul, reached under the front seat and retrieved a 9 millimeter gun, which he then loaded with one bullet. Herron and Wilson took the gun away from Williamson, and Wilson removed the bullet from the chamber.

As the Cavalier approached a stoplight a few blocks from the café, what witnesses described as a "black truck" pulled up on the passenger side of the Cavalier. Herron and Wilson both testified that they thought the black truck was the same vehicle they had seen Paul getting out of at the café. As the black truck pulled even with the Cavalier, the driver of the black truck fired shots into the Cavalier. One shot struck the front passenger door. Another shot hit Williamson, entering his body below the right armpit. Wilson acknowledged on cross examination that he "didn't see who the shooter was," but Herron testified that, although he ducked when the first shot was fired, he was "a hundred percent" certain that Paul was the shooter. After the shooting, Herron drove Williamson to the emergency entrance of Hennepin County Medical Center, where it was determined that Williamson had died.

There was conflicting testimony regarding the specific whereabouts of Paul, Dent, and Spencer on the morning of the murder. Dent testified that while they were outside the café, Paul asked her to go inside to order their food, and then he left, saying that he would be "right back." Dent testified that Paul did not return, and Spencer picked her up at the café. But Spencer indicated on cross examination that he did not pick up Dent at the café that day. Dent further testified that she met Paul at a home in north Minneapolis, and Dent and Paul then drove in Dent's car to their Apple Valley apartment. Dent testified that Paul told her that day "that Fred had shot at him, and he had shot back at him, and it was self-defense." She also testified that Paul told her to tell the

police "that [Paul] was with me. He didn't leave out of my eyesight." Spencer testified that when he saw Paul around 12:15 p.m. on November 7, Paul told him that "he thought he killed Fred." Spencer testified that he "started tripping out" upon hearing this statement and asked Paul what he had done to Williamson. Paul then responded that he had not done anything.

At Hennepin County Medical Center, Herron had walked away from the hospital after leaving Williamson at the emergency room. The police obtained a description of Herron from hospital staff and subsequently found Herron walking in the middle of traffic approximately one block from the hospital. When Herron first spoke with the police, he acknowledged being with Williamson, but failed to mention that there had been a third person in the Cavalier at the time of the shooting. Herron said that he could not recall the name of the café where he had eaten breakfast, and described the shooter's vehicle as a "larger gray vehicle" and "possibly a van." He also stated that he had no information on the shooter.

The police went to the intersection where the shooting occurred. In the northeast corner of the intersection, the police discovered shattered glass and two .40 caliber Smith & Wesson shell casings that appeared to have been run over by a vehicle. A forensic scientist later concluded that the bullet recovered from Williamson's body was "most consistent" with .40 caliber ammunition. Personnel from the Minneapolis police department crime lab examined the Cavalier in which Williamson had been riding and found a bullet hole in the front passenger door window frame, a fired bullet, a broken front passenger window, a blood-like substance, two unfired 9 millimeter bullets, and three cell phones.

Two police sergeants were initially assigned to investigate the murder. These investigators visited with Williamson's family, contacted parole and probation officers, "did some background on [Paul]," processed the Cavalier, and attempted unsuccessfully to locate cooperative witnesses. One year after the shooting, in November 2003, after one of the investigators was transferred to a different unit and the other retired, Sergeant Michael Keefe was assigned to continue the investigation.

In January 2004, Keefe interviewed Herron. At that time, Herron was being held in federal custody in connection with drug and firearm charges. In February 2004, Herron entered into a plea agreement on the federal charges in which he was required to provide "substantial assistance" with the Williamson murder investigation and other cases in exchange for the federal prosecutor's motion for a downward sentencing departure. Keefe interviewed Herron again in February 2004. Keefe also obtained statements from Dent, Wilson, and Spencer that month. Paul was then arrested on March 8, 2004, on an unrelated warrant for terroristic threats.

Before Paul was taken to the jail, Keefe interrogated him at the police department regarding the Williamson murder and another murder in which Paul was a suspect. The interrogation was videotaped by the police. During this interrogation, Paul denied shooting Williamson, denied knowing Williamson well, denied knowing Williamson's nickname, denied ever going to the café with Dent, denied ever riding in Spencer's truck with Dent, identified certain photographs of people related to the investigation, and indicated that he was unable to definitively identify people in other photographs—including Williamson. On March 17, 2004, the state charged Paul by complaint with Williamson's murder. A grand jury later returned an indictment

charging Paul with first-degree premeditated murder and first-degree felony murder while committing the crime of a drive-by shooting.

Before trial, Paul moved to suppress evidence of his custodial interrogation on the basis of a *Miranda* violation. The district court denied Paul's motion. Paul's trial began and the jury was sworn on Tuesday, January 18, 2005. The state called Keefe as a witness, and during his testimony, Keefe described Paul's statement during his custodial interrogation. During its closing argument, the state made reference to the "world" in which several witnesses lived, and at one point referred to the witnesses as "these people." Paul did not object to the comments.

The state rested on January 20, 2005, and the defense rested the same day without presenting any witnesses. After deliberating for nearly six hours, the jury found Paul guilty of first-degree felony murder during a drive-by shooting and second-degree murder, but not guilty of first-degree premeditated murder. This direct appeal followed. Paul raises two issues on appeal: (1) the court erred when it denied his motion to suppress evidence of his custodial interrogation, and (2) he is entitled to a new trial based on alleged prosecutorial misconduct during the state's closing argument because the state "subtly injected racial issues and distinguished between the jurors' world and the world of the defendant, victim, and witnesses." [1]

1. Paul's counsel informed the court at oral argument that Paul withdrew a third issue, regarding the admissibility of recorded telephone calls he made from jail, after briefing.

2. We note that this argument erroneously implies that *Miranda* guarantees the right to place a telephone call to an attorney on demand, not the right to discontinue questioning until counsel is present. *See Miranda v.*

## I.

We first address Paul's argument that the district court erred when it denied Paul's motion to suppress evidence of his custodial interrogation based on an alleged *Miranda* violation. On appeal, Paul argues that during the interrogation he invoked his right to counsel, but Sergeant Keefe failed to terminate the interrogation, and that Paul "eventually succumbed to [Keefe's] badgering and refusal to let him call an attorney." [2] The state concedes that Paul invoked his right to counsel, but asserts that Keefe then attempted to terminate the interrogation, after which Paul initiated further discussions with Keefe. The state further asserts that after reinitiating the conversation, Paul made an effective waiver of his right to have counsel present for questioning.

■ After a Rasmussen hearing, the district court reviewed the *Scales*[3] videotape of Paul's interrogation and ruled that Paul's "statement was freely and voluntarily given," and denied Paul's motion to suppress his statement. The court made no specific findings of fact regarding the circumstances of Paul's purported waiver. We review legal conclusions regarding a purported *Miranda* waiver de novo to determine whether the state has shown by a fair preponderance of the evidence, under the totality of the circumstances, that a suspect's waiver was knowing, intelligent, and voluntary. *State v. Burrell*, 697 N.W.2d 579, 591 (Minn.2005).

*Arizona*, 384 U.S. 436, 471, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. In *State v. Scales*, 518 N.W.2d 587, 592 (Minn.1994), we held that "all custodial interrogation including any information about rights, any waiver of those rights, and all questioning shall be electronically recorded where feasible and must be recorded when questioning occurs at a place of detention."

■ In *Miranda v. Arizona,* the United States Supreme Court held that a criminal suspect has the right to counsel during custodial interrogations. 384 U.S. 436, 471, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Fifteen years later, the Court established in *Edwards v. Arizona* that

> an accused, * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*

451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (emphasis added). We have noted that there are three steps to the *Edwards* analysis. *State v. Munson,* 594 N.W.2d 128, 138–39 (Minn.1999). We first determine whether the suspect invoked his right to counsel during a custodial interrogation. *Id.* Then, if it is shown that a suspect invoked his right to counsel, "courts may admit responses to further questioning only on finding that [the suspect] (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right invoked." *Id.* at 139 (citing *Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984)).

■ As noted earlier, the parties agree that Paul invoked his right to counsel; therefore, the first step of the *Edwards* analysis is satisfied. The state argues that after Paul invoked his right to counsel, Keefe honored Paul's request and attempted to terminate the interrogation, and that Paul initiated further discussions. Our review of the *Scales* videotape confirms the state's contention. The following excerpt of the exchange between Keefe and Paul began with the two men seated across from each other in an interrogation room:

MK: And if people were pointing the finger at me, I'd say, wait a minute, let me explain, but before I do it, I'm gonna have to read you your rights, okay? And you know that you have the right to remain silent?

LP: Yeah, I know.

MK: You don't have to talk to me.

LP: Well, can I use the phone, so I can call my lawyer while we [are] having this conversation?

MK: Um, no. If you want to talk to; you want to talk to a lawyer now or wh..is that what you're telling me?

LP: Am I, on, you telling me you have something to tell me, I don't . . .

MK: I'm telling you I got to read you your rights, then I'm gonna explain to you what's going on. Now, you just told me you wanted a phone to call your lawyer? Do you want a lawyer or not?

LP: Yeah, let me call a lawyer.

MK: Well, I'm not gonna; I'm, I'll just take you to jail. Do you want, do you want, you want a lawyer, is that what you're saying?

LP: Yeah.

MK: Okay, well, we're gonna take you to jail right now, then, Leroy. You have a warrant for the terroristic threats and the . . .

LP: I don't know; who put the warrant out? There was never no police report, so how would there be a warrant?

MK: Okay. You have a warrant right now—a felony warrant for terroristic threats and then we're gonna go over to the county attorney's office and we'll, we're probably gonna charge you for two murders, [*Keefe begins closing binder*] Fred Williamson's murder, as well as [another victim's].

LP: I know I don't have nothing to do with that.

MK: Okay. Well, so be it. [*Keefe places binder on table*]

LP: Okay.

MK: That's your story. This is your last, that's your, [*Keefe stands up*] that, you had the opportunity, so, your ... [*Keefe opens door halfway*]

LP: Opportunity for what? You said you wanted to tell me about some other people? [*Keefe opens door all the way*]

MK: Well, I, you said you wanted a lawyer, so now I can't talk to you. [*Keefe has hand on doorknob*]

LP: Okay, let me call my lawyer.

MK: Well, nah, it's not gonna work that way. [*Keefe is standing in doorway*] I don't have time for you to be calling your lawyer and going through all that. [*Keefe takes another step out of room*]

LP: Well, go ahead, read my statement back; let me hear what you have to say. [*Keefe leans back into room*]

MK: Well, you told me you wanted a lawyer?

LP: I'm just saying, I don't have time for this, that's what I'm trying to tell you.

MK: I'm telling ya, you said you want a lawyer, I can't talk to you if you know, if you want to get a lawyer.

LP: I told you, let me get a phone call anyway.

MK: If you want a phone call, you're gonna have to get the phone call from the jail. I'm telling you right now you asked for a lawyer, so.

LP: And then your one officer said I had a warrant for driving; now, you're telling me that ...

MK: You have a, you have a misdemeanor for driving after revocation, and you also have a felony warrant.

LP: What felony warrant?

MK: For terroristic threats out of Robbinsdale—I've explained that to you.

LP: Em hmm.

MK: And I want to talk to you about these two murders, well, can I ... to give you the opportunity to explain yourself.

LP: ... well, go ahead, talk, let me hear what you have to say. [*Keefe steps out, then remains in doorway*]

We are not persuaded by Paul's argument that the interrogation was never effectively terminated because Keefe did not leave the interrogation room. After Paul invoked his right to counsel, Keefe informed Paul that he would be taken to jail and Keefe gave every indication that he would leave the room as soon as he finished responding to Paul's questions and comments. Keefe was standing in the open doorway and was not saying or doing anything reasonably likely to elicit an incriminating response. The mere fact that Keefe did not completely leave the interrogation room as the police officers did in *State v. Earl*, 702 N.W.2d 711, 717 (Minn. 2005), does not affect our conclusion that Keefe effectively terminated the interrogation. We conclude that after Paul made his first reference to contacting a lawyer, Keefe asked clarifying questions to confirm that Paul was invoking his right to counsel and terminated the interrogation by limiting his comments to informing Paul that he would be taken to jail.

■ We next turn to whether Keefe or Paul initiated further discussions. The Supreme Court has held that "interrogation" includes not only express questioning, but also its functional equivalent. *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The Court stated, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating

response from the suspect." *Id.* at 301, 100 S.Ct. 1682 (footnote omitted). In determining whether police tactics were likely to elicit an incriminating response, the focus of the inquiry is on the perceptions of the suspect, rather than the intent of the police, and the totality of the circumstances surrounding custody of the suspect must be considered. *Id.; State v. Tibiatowski,* 590 N.W.2d 305, 309 (Minn.1999). We have stated that "the central question becomes whether the evidence in the record shows that the officers should have known that their conversation was reasonably likely to elicit an incriminating response from [the suspect] or to get [the suspect] to revoke his right to counsel." *Munson,* 594 N.W.2d at 142.

In *Munson,* we held that the state failed to prove that the suspect had initiated further discussions when, immediately after the suspect invoked his right to counsel, the police officer used the phrases: "remember what I said" and "window of opportunity," both of which referenced the officer's earlier statement that the suspect had a small window of opportunity to talk to investigators. *Id.* at 133, 143. In this case, Keefe made no comparable statements after Paul invoked his right to counsel. Rather, Keefe asked clarifying questions to confirm that Paul was invoking his right to counsel, and having concluded that Paul was invoking his right to counsel, Keefe informed Paul that he would be taken to jail.

Paul then asked Keefe questions about his arrest warrant for terroristic threats. When Keefe responded, he confined his remarks to reiterating that Paul was currently under arrest for terroristic threats and would also likely be charged with Williamson's murder and another murder. Paul replied by denying any involvement with the murders. Despite Paul's specific reference to the murders, Keefe continued

to exercise restraint. He replied, "Okay. Well, so be it," and put his binder on the table in preparation to stand up and leave the room. Shortly thereafter, Keefe stood up, walked to the door, and opened it. He did not close the door and return to his seat until after Paul had expressly stated that he wanted to continue talking with Keefe.

■ We conclude that Paul initiated further discussions when he said to Keefe, "I don't know; who put the warrant out? There was never no police report, so how would there be a warrant?" We also note that Paul's next statement, "I know I don't have nothing to do with [the two murders]" would also appear to qualify as an initiation of further discussions. After Paul invoked his right to counsel but before Paul initiated further discussions, Keefe did not say or do anything that qualifies as the functional equivalent of interrogation.

■ Having concluded that Paul initiated further discussions with Keefe after invoking his right to counsel, the final question is whether Paul then knowingly and intelligently waived his right to have counsel present for questioning. After Paul initiated further discussions, the following exchange occurred:

> MK: And I want to talk to you about these two murders, well, can I ... to give you the opportunity to explain yourself.
>
> LP: ... well, go ahead, talk, let me hear what you have to say.
>
> MK: Well, nah, ah, you got to clarify—do you want a lawyer or not? *[Steps part way back into room]*
>
> LP: Huh?
>
> MK: Do you want a lawyer or not?
>
> LP: Just to talk, go ahead and talk.
>
> MK: Answer the question—do you or ...

LP: I don't need no lawyer. I don't need no lawyer.

MK: You don't need no lawyer?

LP: Yeah.

MK: So, now you're willing to talk to me?

LP: Yes.

MK: Alright. [*Keefe closes door.*] Make sure we're real clear on this, okay, cuz I need a real clear waiver from ya. [*Keefe sits down and picks up binder*]

LP: Em hmm.

MK: We'll do it one more time, okay? You know you have the right to remain silent, right?

LP: Yep.

MK: And you do not have to talk to me. Okay. Anything you say can and will be used against you in court. Do you understand that?

LP: Em hmm (affirmative).

MK: Okay. You have the right to talk to a lawyer now or at any time during questioning. Do you understand that Leroy?

LP: Yeah, I know that.

MK: And if you cannot afford one, one will be appointed for you without costs.

LP: Okay.

MK: Do you understand that?

LP: Yep.

MK: Having those rights in mind, do you want to talk to me right now without your attorney.

LP: Yeah; yes. [*Keefe closes binder and leans forward on table*]

During the foregoing exchange, Keefe remained in the open doorway until Paul told Keefe that he wanted to talk with him without a lawyer present. Keefe then returned to his chair. There is no indication that Keefe was exerting pressure on Paul by the use of body language or tone of voice. After Paul stated that he did *not* want a lawyer, Keefe then read Paul the complete *Miranda* advisory and Paul indicated that he understood his rights. While informing Paul of his *Miranda* rights, Keefe placed specific emphasis on Paul's right to counsel. Moreover, throughout the entire exchange between Keefe and Paul, there are at least 13 times that Keefe (1) asked Paul if he wanted counsel, (2) told Paul he could not talk to him because of Paul's request for counsel, or (3) in other ways referred to Paul's right to counsel.

Having considered the totality of the circumstances, we conclude that Paul's waiver of his right to have counsel present for questioning was knowing, intelligent, and voluntary. We are satisfied that the state has met its burden of proof regarding Paul's purported waiver. We therefore hold that the district court did not err in admitting Keefe's testimony regarding the statement Paul made following his waiver.

## II.

We next address Paul's argument that he is entitled to a new trial due to prosecutorial misconduct during the state's closing argument. Paul argues that "the [state] subtly injected racial issues and distinguished between the jurors' world and the world of the defendant, victim, and witnesses." Paul did not object to the alleged misconduct at trial. When a defendant alleges error for the first time on appeal, we apply the plain error doctrine. *State v. MacLennan*, 702 N.W.2d 219, 235 (Minn.2005) Under the plain error doctrine, there must be (1) error, (2) that is plain, and (3) the error must affect substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998). If these three prongs are met, we then assess whether we should address the error to

ensure fairness and the integrity of the judicial proceedings. *Id.*

We have held that it is improper for the state to appeal to the passions and prejudices of the jury or otherwise seek to distract the jury from its proper role of deciding whether the state has met its burden of proof. *See State v. Morton,* 701 N.W.2d 225, 236 (Minn.2005). We have repeatedly stated that "it is improper to inject race into a closing argument when race is not relevant." *State v. Cabrera,* 700 N.W.2d 469, 474 (Minn.2005); *see also State v. Clifton,* 701 N.W.2d 793, 799 (Minn.2005); *State v. Ray,* 659 N.W.2d 736, 747 (Minn.2003).

■■■ In *Ray,* we reviewed the state's remarks that expressly invited jurors to compare the world of "three young black males in the hood" to the jurors' world and to suburban neighborhoods. 659 N.W.2d at 746 ("This is not a dispute between a businessman * * * from Edina and another businessman * * * from Minnetonka. This is a dispute * * * involving three young black males in the hood in North Minneapolis. This is not your environment, this is the Defendant's environment."). We noted that "[s]uch an invitation asks the jury to apply racial and socio-economic considerations that would deny a defendant a fair trial." *Id.* at 747. "In cases where race should be irrelevant, racial * * * considerations, in particular, can affect a juror's impartiality and must be removed from courtroom proceedings to the fullest extent possible." *Id.* (quoting *State v. Varner,* 643 N.W.2d 298, 304 (Minn.2002)).

In *Clifton,* we addressed lengthy remarks made in the state's closing argument that called on the jury to consider "how different your lives may be from the lives and the lifestyles of many of the people who testified before you and from the victim." 701 N.W.2d at 799. In that case, the state described the Tangletown neighborhood of the defendant and victim as

> a world where people gather on the neighborhood block and hang out. They look for action. They recognize people by sight, know them only by nickname, [do] a little drinking, find some marijuana, smoke a little marijuana, see who is partying, see who's hanging. I'm not saying that that's the life of everybody in that area, of course. But there are some folks who do go there and hang out.
>
> It's a world, at least to some extent, where some people don't trust the system and don't call the police when they see somebody with a gun. They don't run from trouble but almost seem to flirt with it or at least co-exist with it.

*Id.* We concluded in *Clifton* that the state's remarks constituted misconduct because they "were demeaning" and "came close to appealing to passion and prejudice." *Id.* at 800. We expressed dismay that the state had disregarded our admonition in *Ray* to avoid statements that invite "jurors to view a defendant as coming from a different community than themselves." *Id.* (quoting *Ray,* 659 N.W.2d at 747). Nonetheless, we concluded in *Clifton* that a new trial was not warranted because "unlike *Ray,* there was no explicit reference to race or use of race to disparage the defendant." *Id.*

Here, the state began its closing argument with the following comments:

> This is my opportunity to welcome you to the real world. What you've seen in the last few days is a world where an argument is sometimes settled with a gun. A world where a young man gets killed in broad daylight while he's sitting in a car. A world where his friends and other acquaintances won't tell the au-

thorities what really happened until more than a year later. A world where a family has to wait for over a year to find out that something's going to happen about their son's death. Now during jury selection, I told you that you might hear about—from people that you don't like; people who's [sic] lifestyles you don't agree with, aren't familiar with. You've now been introduced to all of that, haven't you?

\* \* \* \*

It certainly wasn't easy for [Herron] to be here. This is part of the real world that I talked about. Part of our community that doesn't trust the police.

\* \* \* \*

Ladies and gentlemen, in these kind of cases, a case where there's people who have relationships with a defendant, relationships to a defendant, in this real world I've described to you, sometimes people don't want to get involved. And these aren't people who keep journals, these aren't people who write a diary, they're not people who may remember absolutely everything, and I don't mean to be disparaging in saying that, but you realize that some of these people live in a very different world, and their memories may not be perfect, but they came in here and told you what it was that they saw happened.

Paul argues that the "absence of phrases like 'young black males' or 'the hood' does not make the [state's] message any less subtle than that in *Ray*," because the defendant, the victim, and all the non-law enforcement witnesses were African American. Paul further argues that "[b]y contrasting the jury's world to 'their world,' the [state] impermissibly invited the jury

to take into account racial and/or socio-economic considerations."[4] The state responds by asserting that race and socio-economic status are not the defining characteristics of the "real world" it described, and that the purpose of the remarks was to urge the jury to look beyond their possible lack of understanding of the witnesses' behavior and to focus instead on the evidence introduced at trial. The state asserts that its "remarks were an attempt to blunt the potential impact of defense counsel's attack" on the state's witnesses. Arguably, blunting the potential impact of the defendant's attempts to undermine the credibility of the state's witnesses was also the purpose of the inappropriate remarks in *Clifton*. But here, the state's remarks were brief—covering approximately two pages of 45—and the language and imagery used to explain the lack of cooperation of witnesses in this case was considerably less inflammatory.

We conclude that the state's remarks in this case did not rise to the level of misconduct because the remarks were brief; the jury was not expressly invited to compare their own "world" with the "real world" described; the remarks summarized the evidence in the case; the remarks were not demeaning; there was no mention of race, culture, neighborhoods, or any particular community; and the remarks were apparently intended to address inconsistencies and the lack of cooperation by witnesses—which were a focus of the defense case—rather than to appeal to the passions of the jury. Because we conclude that the state's remarks did not constitute misconduct, we hold that there was no error, and accordingly, the state's remarks were not plain error.

---

4. The racial makeup of the jury is not clear on appeal. During arguments regarding motions in limine, defense counsel described the jurors as "predominantly white," and the state noted that "we have a good number of African–American and other minority people on the jury."

Although we find no error here, we take this opportunity to remind attorneys and district courts of the concerns we raised in *Clifton* and *Ray,* and encourage attorneys to refrain from using concepts and terms such as different "worlds" or "these people" to refer to the people intimately involved in the case. Such imagery may imply that the people involved with the case are somehow collectively distinguishable from the jurors on an inappropriate basis. If an attorney intends to convey that certain witnesses are credible despite behaving in a way that a juror might not understand, we respectfully suggest that there are other, more appropriate ways to address this concern. Finally, we reaffirm our "strong commitment to rooting out bias, no matter how subtle," and invite all attorneys participating in the criminal justice system to join this effort. *See Cabrera,* 700 N.W.2d at 475.

Affirmed.

PAGE and GILDEA, JJ., took no part in the consideration or decision of this matter.